# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**
No. 17-1388V
(Not to be published)

```
* * * * * * * * * * * * * * * * * * * * * * * *
NICHOLE WAGNER,                    *
                                   *
                                   *      Special Master Corcoran
               Petitioner,         *
                                   *      Filed: May 8, 2019
v.                                 *
                                   *      Six-Month Residual Effects
SECRETARY OF HEALTH AND            *      Requirement; Guillain-Barré
HUMAN SERVICES,                    *      Syndrome; Influenza Vaccine;
                                   *      Denial Without Hearing.
               Respondent.         *
                                   *
* * * * * * * * * * * * * * * * * * * * * * * *
```

*Ronald C. Homer*, Conway, Homer, P.C., Boston, MA, for Petitioner.

*Debra Begley*, U.S. Dep't of Justice, Washington, DC, for Respondent.

## DECISION DISMISSING PETITION[1]

Nichole Wagner filed a petition on September 29, 2017, seeking compensation under the National Vaccine Injury Compensation Program ("Vaccine Program").[2] ECF No. 1. Petitioner alleged that the influenza ("flu") vaccine she received on October 29, 2014, caused her to develop Guillain-Barré syndrome ("GBS"). *Id.* at 1.

---

[1] Although this Decision has been formally designated "not to be published," it will nevertheless be posted on the Court of Federal Claims' website in accordance with the E-Government Act of 2002, 44 U.S.C. § 3501 (2012). **This means that the Decision will be available to anyone with access to the internet.** As provided by 42 U.S.C. § 300aa-12(d)(4)(B), however, the parties may object to the Decision's inclusion of certain kinds of confidential information. Specifically, under Vaccine Rule 18(b), each party has fourteen days within which to request redaction "of any information furnished by that party: (1) that is a trade secret or commercial or financial in substance and is privileged or confidential; or (2) that includes medical files or similar files, the disclosure of which would constitute a clearly unwarranted invasion of privacy." Vaccine Rule 18(b). Otherwise, the whole Decision will be available to the public in its current form. *Id.*

[2] The Vaccine Program comprises Part 2 of the National Childhood Vaccine Injury Act of 1986, 42 U.S.C. §§ 300aa-10–37 (2012) (hereinafter "Vaccine Act" or "the Act"). Individual section references hereafter shall refer to § 300aa of the Act.

Respondent argues that Petitioner can neither meet the requirements for a "Table claim"[3] under the Vaccine Act, nor can she make an evidentiary showing sufficient to support a causation-in-fact (or "non-Table") claim. Rule 4(c) Report at 6–8, filed Aug. 29, 2018 (ECF No. 29) ("Rule 4(c) Rep."). Respondent also asserts, however, that Petitioner cannot satisfy the statutory prerequisite that her vaccine-related injury or the residual effects thereof lasted for more than six months after vaccination.[4] *Id.* at 8–9 (citing Section 11(c)(1)(D)). On these grounds, Respondent moves to dismiss Petitioner's claim. *Id.* at 9. Petitioner opposed dismissal in a brief filed on January 28, 2019 (ECF No. 45) ("Opp."), and Respondent filed a Reply on March 28, 2019 (ECF No. 47) ("Reply").

For the reasons set forth below, I find that Petitioner has failed to satisfy the severity requirement. Accordingly, her claim is **DISMISSED**.

I.   **Factual Background**

Petitioner was born on May 12, 1984. Ex. 1 at 1, filed Oct. 10, 2017 (ECF No. 7-1). Prior to vaccination, her medical history was significant for vocal cord nodules, extraesophageal reflux, migraines, and gall bladder problems. Ex. 2 at 39, filed Oct. 10, 2017 (ECF No. 7-2); Ex. 11 at 3, filed Oct. 10, 2017 (ECF No. 8-2). She became pregnant in 2014, and during her pregnancy, she tested positive for both streptococcus bacteria and parvovirus. Ex. 2 at 68, 73. Ms. Wagner received the flu vaccine on October 29, 2014. Ex. 1 at 1. She gave birth just two weeks later, on November 13th. Ex. 2 at 34–35.

*Injury Onset and Diagnosis*

On November 18, 2014, five days after giving birth, Ms. Wagner presented to the emergency room ("ER") at Greenville Memorial Hospital in Greenville, South Carolina, complaining of swelling in her lower back, jaw, and tongue. Ex. 2 at 59. She was diagnosed by John Milko, M.D., with hypertension and postpartum facial swelling, and was discharged home early the next morning. *Id.* at 60, 64–65. Petitioner subsequently visited her obstetrician on both November 20th and 21st, complaining specifically of facial paralysis, difficulty making facial expressions, progressively worsening facial muscle weakness, and severe facial swelling. *Id.* at

---

[3] The Vaccine Injury Table ("Table") lists certain vaccines associated with specific injuries and illnesses. Section 14(a); 42 C.F.R. § 100.3(a) (2017). When a Petitioner demonstrates that she received a covered vaccine and subsequently suffered an associated injury or illness within the time period provided by the Table, she need not show causation-in-fact in order to be entitled to compensation under the Vaccine Act. *Shalala v. Whitecotton*, 514 U.S. 268, 269–70 (1995). GBS following the flu vaccine (with onset between three and forty-two days post-vaccination) is one such Table claim. 42 C.F.R. § 100.3(a)(XIV)(D).

[4] A Vaccine Program petitioner may also satisfy the severity prerequisite if she dies as a result of her vaccine injury, or if her injury requires surgical intervention and inpatient care. Section 11(c)(1)(D). Neither of these alternatives are applicable in this case. Opp. at 23.

13–14. Later in the day on November 21st, Petitioner was referred to neurologist Sandip Jain, M.D., who posited that Petitioner might have GBS. Ex. 9 at 148, filed Oct. 10, 2017 (ECF No. 7-9). Dr. Jain noted that Ms. Wagner's probable GBS might be linked to her flu shot from three weeks prior, or to an upper respiratory infection Petitioner had experienced approximately four weeks earlier. *Id.* Dr. Jain ordered a brain magnetic resonance imaging ("MRI"), which showed normal results. *Id.* at 245.

Subsequent treater visits helped to refine Ms. Wagner's diagnosis. Records from visits with Dr. Jain and Sergiu Besliu, M.D. (another neurologist) on November 24 and 25, 2014, describe Ms. Wagner's symptoms as facial diplegia[5] and characterize her condition as "possible GBS." Ex. 9 at 233–34. At the direction of Dr. Besliu, Petitioner received five days of intravenous immunoglobulin ("IVIG") treatment. *Id.* at 135–37, 145. Dr. Besliu discharged Petitioner on November 26th with a diagnosis of a mild form of GBS. *Id.* at 136. At a December 8, 2014 follow-up neurology visit, Ms. Wagner's condition was again characterized as "Guillain-Barr[é] syndrome variant facial diplegia." Ex. 4 at 4, filed Oct. 10, 2017 (ECF No. 7-4). Nurse Practitioner Faye Blaszak recorded improvement since Petitioner's November 26th discharge, but stated that she had not yet returned to her baseline. *Id.*

Petitioner had a follow-up visit with Dr. Besliu on January 30, 2015, at which time was noted to be "stable," showing no facial diplegia. Ex. 4 at 2. Dr. Besliu deemed Petitioner to have "almost fully recovered" from her GBS/facial diplegia, but also recorded her complaint of "a new onset of unilateral hand/feet numbness tingling." *Id.* He theorized, however, that this paresthesia[6] could be the product of a vitamin or hormonal imbalance. *Id.* at 2–3. To that end, Dr. Besliu recommended checking Petitioner's vitamin B6, vitamin B12, and thyroid stimulating hormone levels. *Id.* at 2.

*Later Symptoms and Confirmation of Vitamin Toxicity Diagnosis*

Petitioner's next visit with Dr. Besliu took place almost six months later, on July 17, 2015 (nearly eight months after onset of her facial diplegia). Ex. 4 at 12–13. In the intervening months, Ms. Wagner had visited other treaters, but made no mention of any possible GBS sequelae. *See, e.g.*, Ex. 17 at 4–5 (February 10, 2014 gastroenterology visit, noting existence of B12 deficiency but not otherwise discussing facial diplegia or extremity paresthesia); Ex. 2 at 10 (June 25, 2015 gynecology visit, noting history of hospitalization for GBS resulting from flu shot but listing no ongoing symptoms). The filed medical record for this case also does not indicate that in this

---

[5] Facial diplegia is paralysis of both sides of the face. *Dorland's Illustrated Medical Dictionary* 524 (32nd ed. 2012) (hereinafter "*Dorland's*").

[6] Paresthesia is an abnormal touch sensation, such as a tingling or burning feeling, often without an apparent stimulus. *Dorland's* at 1383.

3

timeframe Petitioner ever saw another neurologist. However, notes from the July 17, 2015 visit reflect that Ms. Wagner saw Dr. Besliu for "status post GBS, facial diplegia." Ex. 4 at 13. Dr. Besliu noted that Petitioner had complained of "bilateral upper and lower extremity weakness and tingling," but that these symptoms had completely resolved at the time of this visit, and his examination did not reveal any neurologic deficits or weaknesses. *Id.* at 12–14. More importantly, Dr. Besliu stated that Petitioner's weakness and tingling "had been diagnosed as being related to B6 toxicity"[7] sometime prior to this visit, and that this had been addressed by having her cease taking vitamin B6. *Id.* at 12–13.[8]

Ms. Wagner did not see Dr. Beslui again until February 2016, at which time she again reported bilateral hand and feet numbness. Ex. 4 at 22. She specifically stated that this numbness had begun in September 2015 and had fluctuated intermittently since then. *Id.* But Dr. Besliu did not opine in response that Ms. Wagner's symptoms reflected sequelae of her GBS/facial diplegia, at best allowing for the possibility that this might be a sensory polyneuropathy, and proposing additional testing to confirm. *Id.* at 24. No other subsequent neurologic records were filed in this case.

*Other Evidence of Post-Vaccination Symptoms*

In addition to medical records, Petitioner has provided an assortment of other evidence intended to bulwark her showing on the six-month severity requirement. First, she filed a letter from a chiropractor, Matthew Eiken, D.C., dated October 18, 2017. Ex. 22, filed Oct. 24, 2017 (ECF No. 14-1). In the one-paragraph letter, Dr. Eiken states that he saw Petitioner at his clinic approximately six months after receiving the flu shot (or sometime in April 2015) for treatment of reported spasms and tingling. *Id.* at 2. While Dr. Eiken noted that Petitioner had reported a history of GBS, including "approximately two months" of facial paralysis, he did not opine as to whether her paresthesia symptoms constituted part of the course of her GBS or were an unrelated condition. *Id.* Dr. Eiken's letter does not set forth any direct, personal contemporaneous recollections on his part as to Petitioner's presentation, and only indirectly references the nature and result of treatment she received from his chiropractic clinic. *See, e.g.*, *id.* ("Mrs. Wagner stated," "Mrs. Wagner also indicated," "Mrs. Wagner Reported," and "Mrs. Wagner did appear").

Petitioner did not file any records associated with the treatment she received from Dr. Eiken, asserting that she was unable to do so. *See* Opp. at 22 n.12. In a second letter, Dr. Eiken

---

[7] Toxicity refers to poisonous levels of a given substance. *Dorland's* at 1942. Toxic levels of vitamin B6 are known to lead to severe sensory peripheral neuropathies, featuring symptoms including paresthesia, muscle weakness, and numbness. *Statement on Vitamin B6 (Pyridoxine) Toxicity*, Committee on Toxicity of Chemicals in Food, Consumer Products and the Environment, 2 (1997), https://cot.food.gov.uk/sites/default/files/cot/vitb6tox.pdf (last visited May 8, 2019); *see also Vitamin B6*, National Institutes of Health Office of Dietary Supplements (Sept. 17, 2018), https://ods.od.nih.gov/factsheets/VitaminB6-HealthProfessional (last visited May 8, 2019).

[8] Petitioner does not appear to have filed records memorializing the B6 toxicity diagnosis.

explained that no records are available from Petitioner's visits to his clinic due to a "severe flood" that destroyed all relevant documentation. Ex. 27 at 2, filed Jan. 8, 2019 (ECF No. 39-1). Accordingly, Dr. Eiken's 2017 letter is the sole evidence of this treatment.

Petitioner also provided an affidavit from her husband, Jason Wagner, in which he states that "Nichole experienced pain and twitching in her face and legs for months after she left the hospital. The weakness and tingling in her hands persisted for over a year from when her symptoms first began." Ex. 14 at 5, filed Oct. 10, 2017 (ECF No. 9-3). Mr. Wagner does acknowledge, in accordance with the medical record, that Petitioner began to regain movement in her face in December 2014. *Id.* He further allowed that Petitioner's "[B12] levels were off," which "was not something she experienced before her flu shot and onset of Guillain-Barre syndrome." *Id.* at 6.

Finally, Ms. Wagner submitted a written statement of her own, in which she stated that she continues to experience not only ongoing weakness in her extremities and facial twitching, but also hypersensitivity to cold, anxiety, and panic attacks. Ex. 12 at 7–8, filed Oct. 10, 2017 (ECF No. 9-1). She took an extended leave from her work as a teacher after developing GBS, and ultimately chose not to return to work. *Id.* To support her contentions, Petitioner also submitted her Facebook records, which include a "comment" from October 17, 2017 (three years post-vaccination, and after this action was filed) in which Petitioner wrote: "I still have problems with spasms in my face, weakness in my hands, and my toes hurt, especially in the winter or if I am barefoot." Ex. 28 at 37, filed Jan. 20, 2019 (ECF No. 46-1).

## II.     Procedural History

As noted above, Petitioner initiated her claim on September 29, 2017. In the following months, she filed medical records and affidavits. Respondent filed his Rule 4(c) Report on August 29, 2018, in which he expressed his view that this case should be dismissed due to Petitioner's failure to satisfy the six-month severity requirement. Rule 4(c) Rep. at 9. At my direction, Petitioner filed a brief responding to Respondent's dismissal request on January 28, 2019. *See generally* Opp. Respondent filed his Reply on March 28, 2019. Petitioner has also filed medical literature (in the form of two case reports), along with her Facebook file. *See generally* Ex. 28; T. Ramakrishnan, et al., *Facial Diplegia: A Misleading GBS Variant*, 3 J. Case Reps. 267 (2013), filed as Ex. 31, Jan. 28, 2019 (ECF No. 43-1) ("Ramakrishnan"); N. Sethi, et al., *Facial Diplegia with Hyperreflexia—A Mild Guillain-Barre Syndrome Variant, to Treat or Not to Treat?*, 2 J. Brachial Plexus & Peripheral Nerve Injury 9 (2007), filed as Ex. 32, Jan. 28, 2019 (ECF No. 43-2) ("Sethi"). The question of whether to dismiss Petitioner's claim for failure to satisfy the severity requirement is now ripe for resolution.

### III.    The Parties' Respective Arguments

*Petitioner*

In support of her contention that her GBS sequelae lasted longer than six months, Petitioner asserts that the weakness, tingling, and numbness she experienced in the months and years following her November 2014 GBS diagnosis should be considered "residual symptoms" of her GBS. *See* Opp. at 19, 23. She identifies records noting her still-existent extremity numbness and tingling from the same January 30, 2015 visit with Dr. Besliu at which she was noted to have "almost fully recovered" from her GBS. *Id.* at 21 (citing Ex. 4 at 2). She states further that she continued to experience such tingling and weakness one year later, as noted at a February 5, 2016 visit with Dr. Besliu. *Id.* (citing Ex. 4 at 22–24). Petitioner also cites to Dr. Eiken's letter, in which he states that she was first seen for treatment at his chiropractic clinic approximately six months after receiving the flu vaccine, at which time she was complaining of the symptoms she alleges reflect GBS sequelae. *Id.* (citing Ex. 22 at 2). Based on this evidence, as well as affidavit and Facebook statements reporting twitching, weakness, and tingling as late as autumn 2017, Petitioner asserts that the residual symptoms of her GBS lasted for more than three years after onset. *Id.* at 23.

*Respondent*

The thrust of Respondent's argument is that, while Petitioner may have experienced ongoing numbness, tingling, and weakness in her extremities, these symptoms cannot be considered symptoms or residual effects of her GBS/facial diplegia. Rule 4(c) Rep. at 9; Reply at 2–5. Respondent argues that Petitioner's attempts to link her paresthesia-type symptoms to her alleged GBS must fail. As Respondent maintains, "GBS is a monophasic condition, although significant sequelae can result." Reply at 4 n.5. Because Petitioner's illness presented with facial paralysis that largely resolved two months later, her paresthesia-type symptoms, which began several months after her facial diplegia and fluctuated intermittently over the following years, were "inconsistent with the monophasic nature of GBS." *Id.*

Respondent also notes that no treating physician has ever characterized Petitioner's post-diplegia tingling, weakness, or numbness as sequelae of her GBS. Petitioner's treating neurologist, Dr. Besliu, expressly stated in July 2015 that these symptoms were most likely the product of B6 toxicity (and thus *not* a symptom of her earlier GBS variant). Reply at 3 (citing Ex. 4 at 10, 13). Indeed, Dr. Besliu later declined a second time to attribute Petitioner's symptoms to GBS in February 2016. *Id.* at 3–4 (citing Ex. 4 at 23). Respondent also questions the probative value of Dr. Eiken's letter, noting that he made clear that he relied only on Petitioner's self-reported history of GBS, and argues further that a chiropractor would not be qualified to determine whether Petitioner's symptoms were attributable to her GBS. *Id.* at 4 (citing Ex. 22 at 2). For these reasons,

Respondent asks me to conclude that Petitioner did not experience ongoing symptoms, sequelae, or residual effects of her GBS later than January 30, 2015. *Id.* at 5.

## ANALYSIS

Regardless of whether they allege a Table or non-Table claim,[9] petitioners not asserting a vaccine-related death or other injury requiring a surgical intervention and inpatient care must demonstrate that they suffered the residual effects or complications from their vaccine-related injury for more than six months. Section 11(c)(1)(D); *Cloer v. Sec'y of Health & Human Servs.*, 654 F.3d 1322, 1335 (Fed. Cir. 2011). Petitioners bear the burden of satisfying this severity requirement with preponderant evidence. *Song v. Sec'y of Health & Human Servs.*, 31 Fed. Cl. 61, 65–66 (1994), *aff'd*, 41 F.3d 1520 (Fed. Cir. 1994).

While even mild symptoms that do not require medical care may satisfy the severity requirement, ongoing medical treatment for conditions *unrelated* to the alleged vaccine injury do not. *Compare Wyatt v. Sec'y of Health & Human Servs.*, No. 14-706V, 2018 WL 7017751, at *22–23 (Fed. Cl. Spec. Mstr. Dec. 17, 2018) (petitioner's post-vaccination GBS resolved within three months; subsequent ongoing medical treatment for upper respiratory and gastrointestinal infections did not satisfy six-month requirement), *with Herren v. Sec'y of Health & Human Servs.*, No. 13-1000V, 2014 WL 3889070, at *3 (Fed. Cl. Spec. Mstr. July 18, 2014) (ongoing mild GBS symptoms that did not require medical care nevertheless satisfied severity requirement).

In this case, because Ms. Wagner received the flu vaccine on October 29, 2014, and claims an onset in November, she must demonstrate that her injuries continued through at least mid-May 2015.[10] Petitioner's medical record indicates that she has reported intermittent numbness, tingling, and weakness in her extremities since January 2015. But it does not preponderantly support the contention that these symptoms were GBS sequelae. Rather, Ms. Wagner's treating physicians determined that they were *not* related to her GBS, and Petitioner has provided insufficient persuasive evidence to rebut this conclusion.

---

[9] In this case, Petitioner has not made clear whether she intended to plead her case as a Table claim. *See* Opp. at 14 n.6 (noting that Petitioner did *not* allege at the outset of this case that she fulfilled the criteria for a Table injury in her Petition), 19 (concluding that Petitioner suffered from GBS following receipt of the flu vaccine). But because I find that Petitioner fails to satisfy the six-month severity requirement, I do not reach the question of whether Petitioner has otherwise made a sufficient showing to prevail on either a Table or non-Table claim—or that she has established that she did in fact experience a GBS variant. *See* 42 C.F.R. § 100.3(a)(XIV)(D)

[10] Some special masters have read Section 11(c)(1)(D) as requiring a Vaccine Program petitioner to experience her claimed injury or residual effects thereof later than six months after the date of vaccination, rather than the date of injury onset. *See, e.g.*, *Uetz v. Sec'y of Health & Human Servs.*, No. 14-29V, 2014 WL 7139803, at *3 (Fed. Cl. Spec. Mstr. Nov. 21, 2014). Whether the six-month requirement runs from the date of vaccination or date of onset is not dispositive to my resolution of this matter, however, and my analysis would be the same whether I measure the six-month period from the date of vaccination or date of onset (although I deem the latter to be the more equitable start date for measuring severity).

As Petitioner acknowledges, Dr. Besliu concluded at her January 30, 2015 visit that she had "almost fully recovered" from facial diplegia/GBS at that point—three months from the date of vaccination. Opp. at 12 (citing Ex. 4 at 5). While Dr. Besliu initially postulated in January 2015 that Petitioner's symptoms of tingling and numbness could be related to her case of GBS, he later rejected that conclusion outright, expressly setting forth his view that in fact they were the result of vitamin B6 toxicity. Ex. 4 at 2, 13 (noting that "presence of paresthesia could be a consequence of her GBS although it is worth checking her B6, B12, TSH now" at January 30th visit; subsequently stating in July 2015 that Petitioner's weakness and tingling were "later diagnosed as being related to B6 toxicity," as evidenced by the fact that the symptoms ceased after Petitioner stopped taking B6). Although the medical record filed in this case does not set forth any initial B6 toxicity diagnosis, it also reveals no evidence indicating that Dr. Besliu's recount of it is inaccurate. As Petitioner's primary neurologic treater, Dr. Besliu's opinion is entitled to some degree of deference. *See Andreu v. Sec'y of Health & Human Servs.*, 569 F.3d 1367, 1367 (Fed. Cir. 2009); *Capizzano v. Sec'y of Health & Human Servs.*, 440 F.3d 1317, 1326 (Fed. Cir. 2006) (quoting *Althen v. Sec'y of Health & Human Servs.*, 418 F.3d 1274, 1280 (Fed. Cir. 2005)).

To bulwark her argument, Petitioner offers Dr. Eiken's statement. Although he is a chiropractor (and hence somewhat less competent than Dr. Besliu to comment on the nature and etiology of Petitioner's symptoms), his statement nevertheless has probative value in establishing the existence of symptoms that arguably could reflect GBS sequelae. However, although Dr. Eiken states that he treated Petitioner's spasms and tingling starting around April 2015, his letter does not expressly attribute the symptoms for which he treated Petitioner to her GBS. *See* Ex. 22 at 2. Moreover, there is no corroboration (in the form of contemporaneous record evidence) for his statements about the symptoms Petitioner was experiencing at that time, whereas statements like Dr. Besliu's have ample record support. *See Gerami v. Sec'y of Health & Human Servs.*, No. 12-442V, 2013 WL 5998109, at *4 (Fed. Cl. Spec. Mstr. Oct. 11, 2013) (finding unpersuasive a letter from a treating physician containing conclusory statements about petitioner's symptoms lasting beyond six months when letter lacked citation to medical records), *mot. for review denied*, 127 Fed. Cl. 299 (2014). The medical record on the nature of Ms. Wagner's 2015 post-diplegia symptoms preponderates against her contentions.

Furthermore, Petitioner has provided no persuasive medical or scientific evidence establishing that the GBS variant she experienced—which unquestionably presented with face-related symptoms—would even be *expected* to subsequently progress or devolve into the kinds of symptoms she alleges to have experienced months later. On the contrary, the two items of medical literature she filed undermine that contention. Both articles provided by Petitioner describe the GBS facial diplegia variant as presenting *without* any of the symptoms in the extremities that usually characterize GBS. *See* Ramakrishnan at 268 (describing no sensory loss or motor weakness in extremities); Sethi at 9–10 (describing no motor weakness development, GBS symptoms

isolated to facial diplegia). Neither expresses the view that the medical or scientific community would expect facial diplegia to typically progress to secondary symptoms like the tingling or limb numbness reported by Petitioner. *See* Ramakrishnan at 271 (facial diplegia variant GBS resolving without involvement of extremities or other secondary symptoms); Sethi at 10 (facial diplegia variant GBS resolving in less than six weeks, and without secondary symptoms).

Sethi and Ramakrishnan also have additional deficiencies that render them inadequate support for Petitioner's claim overall. Both are case reports, a kind of evidence long deemed of low probative value in the Program. *See Campbell v. Sec'y of Health & Human Servs.*, 90 Fed. Cl. 369 (2009); *Crutchfield v. Sec'y of Health & Human Servs.*, No. 09-39V, 2014 WL 1665227, at *19 (Fed. Cl. Spec. Mstr. Apr. 7, 2014), *aff'd*, 125 Fed. Cl. 251 (2014); *Bast v. Sec'y of Health & Human Servs.*, No. 01-565V, 2012 WL 6858040, at *39 n.104 (Fed. Cl. Spec. Mstr. Dec. 20, 2012) (listing cases in which limited value of case reports is discussed). In addition, neither of the patients in question experienced the kind of secondary symptoms that Petitioner argues are sequelae of her GBS variant. *See, e.g.*, Ramakrishnan at 269 (patient presented with facial paralysis that later became bilateral, but no limb paresthesia or weakness after initial presentation), 271 ("[i]n our patient, the weakness remained localized to the face with no clinical evidence of progression"); Sethi at 10 (patient's facial diplegia was accompanied by "minimal to no motor limb weakness," and was not reported to have developed such symptoms later). And this literature largely supports the conclusion that, to the extent that what Petitioner experienced is properly considered a GBS variant, it has been deemed so mild (in extent of symptoms as well as duration) that it may not warrant treatment at all. Sethi at 10–11 ("it can be debated if the patient's clinical outcome would have been any different had treatment been withheld").

The other factual statements offered by Petitioner and her husband provide support for the contention that she experienced paresthesia and numbness in her extremities at various times after vaccination, but *not* that these symptoms are attributable to her GBS variant. The consistent view expressed by Petitioner's neurologic treaters in the medical record was that her 2015 symptoms were unrelated to her initial illness, and nothing has been offered to suggest these views are inaccurate. *See Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993) (contemporaneously-created medical records are presumed to be accurate and complete); *Murphy v. Sec'y of Health & Human Servs.*, 23 Cl. Ct. 726, 733 (1991), *aff'd per curiam*, 968 F.2d 1226 (Fed. Cir. 1992), *cert. denied sub nom. Murphy v. Sullivan*, 506 U.S. 974 (1992). Dr. Eiken's letter is similarly unpersuasive, both because it declines to attribute Petitioner's symptoms to her GBS and because it is unsupported by contemporaneous records.

At bottom, Petitioner has offered insufficient persuasive evidence to establish that her extremity numbness, tingling, and weakness were likely symptoms or residual effects of the GBS variant she experienced—which presented with facial diplegia and appears to have been confined to her face. Rather, Ms. Wagner's medical records establish that her treating physicians felt her

diplegia resolved in the winter of 2015, and did not view her ongoing symptoms as the product of her initial illness. As Petitioner's facial diplegia resolved within less than three months of her initial onset, she fails to satisfy the six-month severity requirement set forth in Section 11(c)(1)(D), a critical element of her claim.

## CONCLUSION

Having reviewed the medical records, other evidence, and the parties' respective arguments, I do not find that Petitioner has shown with sufficient preponderant evidence that her GBS or its residual effects lasted for more than six months. Accordingly, Petitioner has not established entitlement to an award of damages and I must **DISMISS** her claim.[11]

**IT IS SO ORDERED.**

s/Brian H. Corcoran  
Brian H. Corcoran  
Special Master

---

[11] Pursuant to Vaccine Rule 11(a), the parties may expedite entry of judgment by filing a joint notice renouncing their right to seek review.